**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **FRANK HOLLINGSWORTH** | : | |
| | : | |
| v. | : | **CIVIL ACTION NO. 19-2754** |
| | : | |
| **R. HOME PROPERTY** | : | |
| **MANAGEMENT, LLC** | : | |
| *doing business as* | : | |
| **PARK VIEW AT OAK CREST, ET AL.** | : | |

---

**McHUGH, J.**                                                                 **OCTOBER 27, 2020**

## MEMORANDUM

### I.      Introduction

The Family Medical Leave Act and Americans with Disabilities Act provide important protections for workers.  But the safe harbor provided by those statutes does not prevent an employer from discharging an employee if there is a legitimate basis for doing so.  The issue before me is whether Defendants violated Plaintiff's rights by firing him when he returned from medical leave.  Upon review of the record, Defendants have brought forth substantial, uncontroverted evidence that Plaintiff was terminated for reasons of performance and conduct.  Despite the sheer quantity of evidence to which Plaintiff  points in seeking to identify a material issue of fact, he lacks evidence of pretext or evidence that might suggest an unlawful purpose.  Accordingly, Defendants' Motion for Summary Judgment must be granted.

### II.      Relevant Facts

Enterprise Residential, LLC, f/k/a R Home Property Management, LLC ("Enterprise"), operates affordable housing communities. *See* Second Am. Compl. ¶ 7, ECF No. 35; Dfs.' Mot. For Summ. J. 1, ECF No. 33.  One such community is an unassisted, senior living facility named

Park View at Oak Crest ("PVOC"), which is located in Harleysville, Pennsylvania. Hollingsworth Dep. 139; Second Am. Compl., ¶¶ 7, 13.

Plaintiff Frank Hollingsworth began working at PVOC in 2005. Hollingsworth Dep. 10, ECF No. 33-2. He became the property manager in 2009. Ex. H, ECF No. 33-2. As property manager, Plaintiff was responsible for the implementation and monitoring of compliance with Enterprise's internal procedures as well as external regulatory requirements.[1] Hollingsworth Dep. 33; Ex. L, ECF No. 33-2. He was charged with collecting rent, and "maintain[ing] accurate records." Hollingsworth Dep., p. 33; Ex. L.

For example, every year residents would certify their income and assets, and Plaintiff was responsible for "oversee[ing]" that process—Hollingsworth Dep. 43-44—in other words ensuring that those certifications were accurate. Hollingsworth Dep. 43-45, 164-66; Harbison Dep. 34, 35, ECF No. 33-2. He would then submit the certification to a compliance analyst who would review it to ensure that "the paperwork was complete," and the file would be sealed, "to be activated on the new lease date." Hollingsworth Dep. 44, 47-48.[2]

On November 28, 2018, Mr. Hollingsworth took a leave of absence under the Family Medical Leave Act "FMLA." Hollingsworth Dep. 66, 147; Pl.'s Resp. to Dfs.' Req. for Admis. No. 8, ECF No. 33-2. His leave was immediately preceded by an incident on November 13, 2018, when Plaintiff injured a supervisee during an altercation. Ex. O, P, Q, ECF No. 33-2. The incident resulted in a Performance Counseling Statement that included a "[f]inal [w]ritten"

---

[1] Noncompliance with the applicable HUD guidelines can create negative consequences for the Defendants because of the potential for tax credit "recapture." Exhibit N, ¶¶ 3, 4.

[2] The deposition testimony of property managers Susan Harbison and Megan Norwood is consistent: "They will not seal th[e] file, which is the final seal of approval statement that they'll give us, without everything being in accordance with HUD guidelines." Harbison Dep. 36, ECF. No 33-2; Norwood Dep. 85, ECF No. 33-2.

warning due to "[t]hreatened or actual physical violence," prepared by his supervisor Victoria

Graves ("Graves") and Human Resources Business Partner Kristen Madzarac ("Madzarac") on

November 27, 2018. Ex. R, ECF. No. 33-2; Ex. S, ECF No. 33-2; Hollingsworth Dep. 140.  The

warning stated that "[a]nother breach in our confidence in your ability to carry out your

managerial role will result in additional disciplinary actions up to and including termination."[3]

Ex. S.

     Plaintiff went to the emergency room that night, where he was diagnosed with acute

stress reaction and post-traumatic stress disorder. Hollingsworth Dep. 137-38; Ex. U, ECF No.

33-2; Ex. V, Pl.'s Resp. to Interrog. No. 2, ECF No. 33-3.  Plaintiff informed Graves of the

situation, forwarded her the medical information, and submitted FMLA documentation.

Hollingsworth Dep. 147; Ex. W, ECF No. 33-2; Ex. X, ECF No. 33-2.

     Plaintiff took leave starting that day. Hollingsworth Dep. 66, 147; Pl.'s Resp. to Defs.'

Req. for Admis. No. 8.  His supervisor Graves responded by contacting Megan Norwood

("Norwood"), another property manager, to ask for assistance with coverage at PVOC. Norwood

Dep. 12-13, 21-23, ECF No. 33-2; Graves Dep. 6, 18, 46-47, ECF No. 33-2.  Graves also

requested assistance from property manager Susan Harbison ("Harbison") and others.  Graves

Dep. 26-27, 46-47; Norwood Dep. 29; Harbison Dep. 27-28. Graves also had the locks on the

manager's office changed. Graves Dep. 156-157.[4]  Plaintiff states that his belongings were

---

[3] Although Plaintiff disagrees with Defendants regarding the nature of the altercation, there is no dispute that he signed the disciplinary paperwork following the incident. Hollingsworth Dep. at 122-124.

[4] Although Plaintiff points out that there is no written policy regarding the changing of locks when an employee takes leave, multiple employees testified in their depositions that they understood it to be Enterprise's official policy. Norwood Dep. 79-80; Graves Dep. 156-157.  Moreover, as will be discussed *infra*, Plaintiff appears to have been an active participant in this process. Ex. SS, ECF No. 33-2.

removed from his office around this time and placed in a different office. Hollingsworth Dep. 57; 131.[5]

A month into Mr. Hollingsworth's leave of absence, Graves responded to an email from Regional Manager Sherry Beachley relating to coverage at PVOC. Ex. Q, ECF No. 34-1.  In the initial email, Beachley expresses an interest in having Norwood mentor one of her supervisees, but is worried about overextending Norwood because she is already covering for the Plaintiff. *Id.* Beachley asks Graves if Plaintiff is still out on leave. *Id.*  Graves responds: "Frank is still out.  If he does not return there is plans for . . . [Norwood] to permanently cover . . . ." *Id.*  Beachley writes back: "Frank is still out? WOW." *Id.* Graves answers that she "is doubtful that Frank returns, but he might surprise us!" *Id.*  Beachley responds: "[a]s for Frank, may be best if he did not return." *Id.*  Graves does not address Beachley's comment in her final response concluding the email chain. *Id.*

Meanwhile, Harbison was providing coverage for Plaintiff at PVOC, where she observed that resident Jane French's daughter was assisting French with $200/month to cover rent. Harbison Dep. 40; Ex. CC, ECF. No. 33-6. Harbison investigated and found a consistent pattern of $200 checks going back at least 16 months. Harbison Dep. 57-60, 94; Ex. BB, ECF. No. 33-6; Ex. CC.  Yet Harbison did not see the assistance documented, as it should have been per Chapter 5 of the HUD Occupancy Handbook. Ex. M, ECF No. 33-2; Ex. BB; Harbison Dep. 57. According to the HUD Occupancy Handbook, "[o]wners must count as income any regular contributions and gifts from persons not living in the unit." Ex. M.[6]

---

[5] In his deposition, Plaintiff states that when he walked by the office to visit his mother, a resident at PVOC, "you could see all my personal belongings were not there on the walls." Hollingsworth Dep. 131. Later, after he was terminated, Plaintiff requested the return of belongings, including items in his desk, his backpack, and the "certifications hanging on his wall." Exhibit VV, 802.

[6] Jane French states that during the course of her conversations with Harbison, Harbison once referred to Plaintiff as the "former manager." French Dep. 16.

Harbison noticed also that French's file was sealed, Harbison Dep. 59, 109, meaning that Plaintiff had submitted the file for review to the compliance office, and a compliance analyst had determined that "the paperwork was complete." Hollingsworth Dep. 44-48.  Indeed, Hollingsworth had provided the file to the compliance unit for final review on October 22, 2018, and it had been sealed on October 24, 2018, months earlier. Hollingsworth Dep. 202-205; Ex. C, ECF No. 33-2.  Harbison communicated the discrepancy to Graves on or around January 2, 2018. Harbison Dep. 93-96.

Plaintiff acknowledges that Harbison's actions upon discovery of the missing documentation were "appropriate," "expected," did not "have anything to do with [his] request for FMLA leave," and were "[u]nrelated to [his] accommodation request." Hollingsworth Dep. 242, 247, 251.  Indeed, according to the Plaintiff, Harbison "ha[d] an obligation to launch an investigation." Hollingsworth Dep. 245.[7]

After hearing from Harbison, Graves notified Monica Areford, her supervisor, of the situation. Ex. HH, ECF No. 33-6; Graves Dep. 19.  She also informed Areford that Plaintiff had advised her that French's daughter had "stopped assisting in rental payments" nine months earlier. Ex. II, ECF. No. 33-6.  That was because in April 2018, Plaintiff had assisted French, a friend of his mother's, with securing a lower rental amount for her unit on the very basis that the payments were stopping. Hollingsworth Dep. 96, 282; Ex. II.

Graves also reported the issue to Madzarac. Ex. HH; Ex. II, ECF No. 33-6; Madzarac Dep. 54-56, ECF No. 33-6.  Shortly thereafter, Madzarac sent an email to her supervisor, Lorraine Gordon ("Gordon"), Vice President of Human Resources, Areford, and Diane Edwards,

---

[7] Plaintiff disputes the manner of Harbison's investigation. Hollingsworth Dep. 247.

then President of Enterprise, in which she referred to the situation as "the Frank Hollingsworth 'termination' issue." Ex. LL, ECF No. 33-2. According to Gordon, Plaintiff's actions were considered "terminable" at that time. Gordon Dep. 20-21, 44. However, Defendants wished to meet with Plaintiff and allow him the opportunity to explain his actions before deciding on the appropriate course of action. Gordon Dep. 22, 38. Accordingly, Madzarac contacted Hollingsworth to arrange an interview. Madzarac Dep. 45, 49.

On January 22, 2019, Madzarac called Hollingsworth. Hollingsworth Dep. 76. The nature of the conversation is in dispute.[8] According to Plaintiff, Madzarac repeatedly asked Plaintiff when he would be returning to work. Hollingsworth Dep. 64. Plaintiff also states that he explicitly (and unprompted by anything Madzarac said)[9] raised the possibility of separation during the phone call. According to Plaintiff, he asked if the decision to terminate him had already been made, and Madzarac stated she could not "speak to that." Hollingsworth Dep. 78. Plaintiff states he told Madzarac that "if the decision had already been made to fire me, I would hope I would be offered some professional courtesy due to my performance and my tenure with the company." *Id.* Plaintiff elaborates that "what I had said was that if the company had already made the decision to fire me, I would hope that there would be some sort of professional courtesy and that you would be aboveboard with me about it." Hollingsworth Dep. 79.

Enterprise next sent a separation and release agreement to Hollingsworth by letter, stating: "you said you were interested in coming up with a negotiated departure from the

---

[8] Madzarac's version of the call is substantially different, but given that I am assessing Defendants' Motion for Summary Judgment, at this stage I view "the record in the light most favorable to [the non-moving party]." *Jones v. School Dist. of Phila.*, 198 F.3d 403, 409 (3d Cir. 1999) (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 n.3 (3d Cir. 1998) (en banc)).

[9] Plaintiff argues that he raised the issue because of Madzarac's "tone, and his belief based on [Defendants'] changing the locks and statements from tenants they had hired a new property manager for the site." Pl.'s Resp. to Dfs.' Mot. For Summ. J. 4, ECF No. 34.

company." Ex. NN, ECF. No 33-6.  The letter advised that the purpose of Madzarac's January

22, 2019 call was:

> to schedule a meeting with you to discuss information that had come to light during your
> absence suggesting that you violated policy by failing to identify certain payments that
> were made on behalf of a resident for an extended period of time. By law, such payments
> must be disclosed and reported. Before making a decision about the consequences of this
> for your employment, we wanted to give you an opportunity to explain.

*Id.*  It further stated that Plaintiff had 21 days to consider the proposed agreement, under which

his separation would be effective March 1, 2019. *Id.*

On February 25, 2019, Plaintiff responded by email, stating that Madzarac had

"inaccurately phrased our conversation" and that he would "prefer to work," Ex. OO, ECF No.

33-6, but that if they were still intending to terminate him, to please confirm, and "I will

reconsider if I need to take the severance." *Id.*  Madzarac replied that there was no intention to

inaccurately characterize the conversation and that "it is important that we meet so that you can

address the issue which bears on whether you will remain employed." *Id.*  Hollingsworth agreed

to meet that Thursday, February 28, 2019. *Id.*

As planned, Plaintiff met with Graves and Madzarac on February 28, 2019.  Plaintiff

secretly recorded the meeting. Hollingsworth Dep. 25-27; Graves Dep. 85; Ex. B, Plaintiff's

Audio Recording of February 28, 2019 Meeting, ECF No. 33-2.  Madzarac and Graves raised the

lack of any documentation of assistance from French's daughter. Ex. B at 0:16-1:19.

Highlighting that he did not have the file in front of him to review, Plaintiff nevertheless stated

that he had left a note to himself in French's file indicating that he needed a gift letter

documenting the income. *Id.* at 9:10-9:39, 11:54-12:34.  Plaintiff stated that "file was still

waiting for the gift verification to come back"—and that he had sent out the verification to

French's daughter. *Id.* at 1:46-2:25.  He stated that "I had every January file sealed I think except

hers waiting for that to return so I was waiting for it to return as well – her certification." *Id.* at

12:52-13:10.  Graves then asked, "in this case, you said the last form you were waiting for was

the gift letter," to which Hollingsworth responded "[t]hat is correct." *Id.* at 14:05-14:14.  Plaintiff

also admits that he does not "believe there's any reason to believe it would be legal" "to not

calculate" Ms. French's income properly but that any issue with the file, if there was indeed an

issue, could be attributed to "human error." Ex. B at 6:06-6:33, 18:40.

Plaintiff also advised that he was ready to return to work—that he had been cleared by his

doctor. *Id.* at 21:02.  Madzarac explained that he would be suspended pending the completion of

the investigation into the discrepancies with the French file. *Id.* at 21:02.

After the meeting, Graves asked compliance analyst Jovann Swan for any emails relating

to French's file. Graves Dep. 100-101, 155; Ex. C, ECF No. 33-2.  Swan provided emails from

the fall of 2018 where Plaintiff had informed the compliance office that French's file was ready

for review—contrary to what Plaintiff had stated at the meeting. Graves Dep. 101; Ex. C.  The

emails showed that the file was ultimately sealed on October 24, 2018. Ex. C. Graves also

contacted Norwood to ask that she review the French file for "anything pending or a stick note

stating that we were waiting on some kind of information." Norwood Dep. 84; Graves Dep. 155.

Norwood did not find such documentation and informed Graves. Norwood Dep. 84; Graves Dep.

154-56.

Thus for the purposes of Defendants' investigation, Graves had reason to conclude that

everything Plaintiff had said about the French file at the meeting was inaccurate.  Plaintiff had

presented the file to compliance to review for completeness months before; compliance had

sealed the file. Graves Dep. 101, 119.  Following the investigation, Graves recommended that

Plaintiff's employment be terminated. Graves Dep. 118-120, 156; Madzarac Dep. 89-90; Gordon

Dep. 50, 66.  On March 5, 2019, Enterprise wrote Plaintiff advising him of the termination. Ex.

QQ, ECF No. 33-6.  The letter laid out the basis for the decision:

> It is clear that you are aware of the policy for recording recurring payments because a review of resident files shows that you followed that policy for multiple residents. You did not follow that policy for a resident with whom you have a personal friendship, represented to Tory Graves that the payments had stopped (your explanation for offering the resident a lower rental rate) and then failed to inform Tory that the payments continued.

*Id*. The letter continues:

> Your additional explanation -- that you were awaiting an affidavit from the resident for the recurring payments - also is inconsistent with both the fact that there was no notation of this in the resident file and that the file was sent to Compliance, approved and sealed with nothing from you flagging that the file was not yet complete.

*Id.* Finally, it states:

> Frank, while "human error" (your overall explanation) might account for the failure to record a payment or two, failing to record 16 checks cannot be ascribed to human error.

> As you know, you were placed on a final warning on November 27, 2018 for unacceptable conduct, more specifically Threatened or Actual Physical Violence. This, coupled with your above conduct, has caused management to lose confidence in you.

*Id.*  On March 26, 2019, Enterprise first began looking for Hollingsworth's replacement. Ex. RR,

ECF No. 33-6.  They hired his replacement in June. *Id.*

### III.    Controlling Standard

Federal Rule of Civil Procedure 56(a) states: "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Plaintiff has the burden of proof at trial, so "[i]f the

non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden .

. . by showing that the nonmoving party's evidence is insufficient to carry that burden.'"

*v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Wetzel v. Tucker*, 139 F.3d 380, 383 (3d Cir. 1998)).

"To show that the nonmoving party's evidence is insufficient to meet its burden at trial, Defendant must show there is not enough evidence supporting each element of Plaintiff's claims 'to enable a jury reasonably to find for the nonmoving party on that issue under the governing substantive law.'" *Davis v. Temple University Hospital, Inc.*, No. 14-5981, 2015 WL 7180505, at *4 (E.D. Pa. Nov. 16, 2015) (internal citations omitted). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322– 23 (1986) ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.") (internal citations omitted).

The court should "view the record in the light most favorable to [the non-moving party] and resolve all reasonable inferences" in the non-moving party's favor. *Jones*, 198 F.3d at 409. However, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue. *Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 325). "[T]he mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on the issue." *Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1308 (3d Cir. 1995) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)).

## IV.    Plaintiff's Claims under the Americans with Disabilities Act ("ADA")

Plaintiff alleges that Defendants discriminated against him due to "fears or misperceptions they had against an individual diagnosed with PTSD and acute stress & an

anxiety disorder." Pl.'s Resp. to Dfs.' Mot. For Summ. J. 3.  He also claims that Defendants failed to make reasonable accommodations in the form of an extended leave of absence beyond what was required by the FMLA, and finally that they retaliated against him for taking his 12-week leave of absence. *Id.* at 14-15, 18-19.

### A.  Discrimination Claims

Plaintiff claims not only that Defendants discriminated him because of his disabilities, but also that they failed to make reasonable accommodations in the form of an extended leave of absence beyond what was required by the FMLA. Pl.'s Resp. to Dfs.' Mot. For Summ. J. 14, 18-19.

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Thus an "employer can unlawfully 'discriminate' within the meaning of the ADA" in two ways: "(1) if the employer takes adverse action against a qualified individual with a disability and that decision was motivated by the individual's actual disability . . .  (i.e. disparate treatment); or (2) if the employer fails to make reasonable accommodations for that individual." *Isley v. Aker Philadelphia Shipyard*, 275 F. Supp. 3d 620, 626 (E.D. Pa. 2017) (citing *Fuoco v. Lehigh Univ.*, 981 F. Supp. 2d 352, 361 (E.D. Pa. 2013).  I will separately address Plaintiff's "disparate treatment" and "failure to accommodate" claims.

### i.     Plaintiff's Disparate Treatment Claim

Where plaintiffs seek to rely on circumstantial evidence to prove their disparate treatment claims under the ADA, the prevailing mode of analysis is the well-known *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973);

*Walton v. Mental Health Ass'n. of Se. Pennsylvania*, 168 F.3d 661, 667–68 (3d Cir. 1999) (citing

*Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 68-69 & n.7 (3d Cir. 1996)

("The *McDonnell Douglas* Title VII burden shifting rules apply to claims of discriminatory

treatment under the ADA.").

"[I]n order for a plaintiff to establish a prima facie case of discrimination under the ADA,

the plaintiff must show: (1) he is a disabled person within the meaning of the ADA;

(2) he is otherwise qualified to perform the essential functions of the job, with or

without reasonable accommodations by the employer; and (3) he has suffered an otherwise

adverse employment decision as a result of discrimination." *Isley v. Aker Philadelphia Shipyard*,

275 F. Supp. 3d 620, 626 (citing *Taylor*, 184 F.3d at 306).  If Plaintiff succeeds, "then the burden

shifts to the Defendants to articulate a legitimate nondiscriminatory reason for . . . [the]

termination." *Id.*  If the Defendants carry their burden, Plaintiff "must prove that the articulated

reason was a mere pretext for discrimination." *Id.* at 627.

First, Defendants dispute that Plaintiff has produced evidence sufficient for a reasonably

factfinder to determine that is disabled under the ADA. Dfs.' Mot. For Summ. J. 45.  I disagree.

The ADA defines disability as "a physical or mental impairment that substantially limits one or

more major life activities of such individual; a record of such an impairment; or being regarded

as having such an impairment . . . ." 42 U.S.C. § 12102. The statute's implementing regulations

provide:

> The primary object of attention in cases brought under the ADA should be whether
> covered entities have complied with their obligations and whether discrimination has
> occurred, not whether an individual's impairment substantially limits a major life activity.
> Accordingly, the threshold issue of whether an impairment "substantially limits" a major
> life activity should not demand extensive analysis.

29 C.F.R. § 1630.2.

Here, Plaintiff was diagnosed with acute stress reaction and post-traumatic stress disorder on or around November 28, 2018, the same night that he received a final warning from Defendants regarding the altercation that had occurred on November 13, 2018 with his supervisee. Ex. U.  Plaintiff's deposition testimony reveals that prior to the incident with his supervisee, he was already under a "tremendous amount of stress" as a result of being subject to threats of violence by a resident's family member, who had threatened the lives of the entire property management staff. Hollingsworth Dep. 71-73; Pl.'s Resp. to Dfs.' Mot. For Summ. J. 10.

Plaintiff's disability limited his ability to perform daily life activities, including but not limited to working, sleeping, and focusing. Second Am. Compl. ¶ 16.  His initial doctor's note, dated November 28, 2018 states that "[h]e has lost weight, is unable to eat much, cries frequently, has difficulty sleeping and is unable to focus." Ex. U.  Similarly, his progress report dated December 6, 2018 from psychologist Harry Orenstein, PhD, showed "continued insomnia, diminished appetite, itching, chest constrictions, swelling in lips, tongue." Ex. GG, ECF No. 34-6.  As of December 20, 2018, the progress notes from Dr. Orenstein continued to note sleep problems. Ex. Y, ECF No. 34-3.

Accordingly,  a reasonably jury could find that Plaintiff's diagnosis of acute stress disorder and post-traumatic stress disorder qualifies as a disability under the ADA.  Indeed "[r]egulations clarifying what constitutes a disability under the ADA state that '. . . post-traumatic stress disorder' substantially limit[s] major life activities." *Jones v. Thomas Jefferson Univ. Hosps., Inc.*, No. CV 13-4316, 2019 WL 5588824, at *8 (E.D. Pa. Oct. 29, 2019) (citing 29 C.F.R. § 1630.2(j)(1)(3)(iii) (alterations in original));[10] *see Sherback v. Wright Auto. Grp.*, 987 F.

_____

[10] Similarly, the relevant EEOC Guidance states that "[i]f you have depression, post-traumatic stress disorder (PTSD), or another mental health condition, you are protected against discrimination and harassment at work

Supp. 433, 436 (W.D. Pa. 1997)("[t]here is no doubt PTSD is a psychiatric impairment which may qualify for disability status under the ADA if the impairment substantially limits a person's major life activities or is regarded by the employer as doing so.").[11]

Having found that Plaintiff has produced sufficient evidence from which a reasonable jury could determine that he is disabled within the meaning of the ADA, I move onto the second prong of the analysis.  Here, Defendants have not contested that Plaintiff is otherwise qualified to perform the functions of the job.  Instead they claim that he has not suffered an adverse employment decision as a result of discrimination.

As to the third prong, to demonstrate a prima facie case of causation, Plaintiff must point to evidence sufficient to create an inference that a causative link exists between his disability and his termination. *See Isley*, 275 F. Supp. 3d at 628.  The burden of proving the prima facie case "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995). ("The prima facie case merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'") (internal citations omitted).

In cases where "the temporal proximity is not so close as to be unduly suggestive" of causation, the Third Circuit has recognized that the trial court may examine "timing plus other evidence . . . ." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). "Courts measure temporal proximity from the first date on which the litigant engaged in his protected activity." *Capps v. Mondelez Glob. LLC*, 147 F. Supp. 3d 327, 337 (E.D. Pa. 2015), *aff'd*, 847

---

because of your condition." U.S. EQUAL EMP. OPPORTUNITY COMM'N, EEOC-NVTA, DEPRESSION, PTSD, & OTHER MENTAL HEALTH CONDITIONS IN THE WORKPLACE: YOUR LEGAL RIGHTS (2016).

[11] Because "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active," the fact that Plaintiff was ready to return to work on February 28, 2019 at the end of his FMLA leave does not foreclose a finding of disability. *Isley*, 275 F. Supp. 3d at 627 (citing 42 U.S.C. § 12102).

F.3d 144 (3d Cir. 2017). Here, Plaintiff sent the doctor's note to his supervisor on November 28, 2018, requested a leave of absence that day, and was terminated on March 5, 2020. Hollingsworth Dep. 147; Ex. W; Ex. QQ.  There is at least a three-month gap between when he made his employer aware of his disability and the termination. See *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004) (two months is not unusually suggestive). Thus, the temporal proximity in this case is not unusually suggestive.

Plaintiff must now point to evidence which could establish a reasonable inference of causation using other evidence. *Id.* at 760.  Again, "[t]he prima facie case merely 'raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors.'" *Sempier*, 45 F.3d at 728.

Viewing the facts in the light most favorable to the Plaintiff, he has met this burden. After he took leave but before the investigation into the French file, Defendant Graves' changed the locks to his office without a written policy behind that decision. Graves Dep. 156-57. Plaintiff contends this was done out of fear resulting from the disclosure of his disability. Pl.'s Resp. to Dfs.' Mot. For Summ. J. 3.  Next, Susan Harbison, who was filling in for Plaintiff at PVOC, referred to Plaintiff as the "former manager" to resident Jane French sometime in January 2019—prior to his termination. French Dep. 16.  Additionally, Regional Manager Beachley stated to Plaintiff's supervisor that it might be best if Plaintiff did not return from leave. Ex. Q, ECF No. 34-1.  Then, Human Resources Business Partner Kristen Madzarac sent an email to management referring to the "Frank Hollingsworth 'termination' issue" on January 9, 2019, prior to the conclusion of Defendants' investigation into the French file. Ex. LL.  Finally,

he received two separate notices discussing his separation from the company, which he argues are not inconsistent. Ex. NN; Ex. QQ.

The question then is whether the Defendants have put forth a legitimate nondiscriminatory justification for the termination. Defendants argue that the court should look no further than the March 5, 2019 termination letter, which spells out their reasoning. Ex. QQ. The letter states that they terminated Plaintiff because they found his explanations with regard to their investigation into his failure to document French's income over the course of 16 months unsatisfactory. *Id.*  This investigation ultimately caused them to "lose confidence" in the Plaintiff. *Id.*[12]  Accordingly, Defendants argue that "Hollingsworth was aware of the need to document the assistance French was receiving, . . . which he failed to do (which is undisputed) . . . ." Dfs.' Reply Br. 9.  Afterwards, "his statements . . . that he was awaiting further documentation was found not to be true." Dfs.' Reply Br. 9  "That, coupled with his unsatisfactory explanation and prior written warning, led to his termination*." Dfs.' Reply Br. 9.

Plaintiff argues that Defendants proffered reason is pretextual.  To show pretext, a plaintiff must point so some evidence from which a factfinder could reasonably infer that that the disability  "played a role in the decision-making process . . . and . . . had a determinative effect on the outcome of that process." *CG v. Pennsylvania Dept. of Educ*., 734 F.3d 229, 237 & n.11 (3d Cir. 2013) (quoting *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 301 & n.4 (3d Cir. 2007). Stated differently,

> [t]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

---

[12] The letter reminds Plaintiff that Defendants had already issued a final warning prior to his taking FMLA leave for his "unacceptable conduct, specifically Actual or Threatened Physical Violence." Ex. QQ. Again, that warning had stated that "[a]nother breach in our confidence in your ability to carry out your managerial role will result in additional disciplinary actions up to and including termination." Ex. S.

*Fuentes v. Perskie*, 32 F.3d 759, 764 (3d. Cir.1994). Under the ADA, the disability must have been a "but-for" cause of the termination. *Furgess v. Pennsylvania Dept. of Corrections*, 933 F. 3d 285, 293 & n.25 (3rd Cir. 2019). In contrast to the usually insubstantial burden of establishing causation, which "is not intended to be onerous," *Sempier*, 45 F.3d at 728, demonstrating pretext is a more "difficult burden" under the *McDonnell Douglas* framework. *Fuentes*, 32 F. 3d at 765. To meet this burden, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them 'unworthy of credence' . . . ." *Id.* (internal citations omitted).

Plaintiff urges me to consider that Defendants' proffered reason is pretextual because the act of sealing the resident file at PVOC is, in his view, insignificant. Hollingsworth Dep. 49.  He maintains that files may be unsealed "[w]here additional information is found," or when the property manager "discovers perhaps an omission and an error that was not caught by compliance." Hollingsworth Dep. 48; Pl.'s Resp. to Dfs.' Mot. for Summ. J. 27.  Yet Plaintiff's own testimony reveals that there was nothing new to discover with regard to French's file. Plaintiff states he was aware of the ongoing payments from French's daughter *prior* to his submission to the compliance unit that the file was ready to review. Hollingsworth Dep. 103.  In other words, he had submitted French's file to a compliance analyst despite the fact that he *already knew* information was outstanding. Hollingsworth Dep. 202-205; Ex. CC.[13]  Thus viewing the facts as Plaintiff has presented them, I find this argument unpersuasive.

---

[13] Specifically, Plaintiff states that he had a conversation with French about the need for documentation of the income sometime around October 5, 2018, but that he nevertheless submitted the file to the compliance unit as "ready for review" on October 22, 2018. Again, such a submission to the compliance unit happens so that an analyst can verify that the "paperwork [is] complete." Hollingsworth Dep. 44.

Plaintiff next argues that the dispute over whether his belongings were removed from his office after he took leave is a genuine issue for the jury. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 15. But Plaintiff 's deposition testimony that he noticed the removal of his belongings while walking past his office is simply insufficient to cast doubt on the Defendants' proffered nondiscriminatory reason. Plaintiff sent an email to Madzarac in March 2019 *following the termination*, asking for the return of "items in his desk, his backpack, and certifications hanging on the wall." Ex. VV, ECF No. 33-7. Although I must view the record in the light most favorable to the Plaintiff, I need only resolve *reasonable* inferences in the non-moving party's favor. *Jones,* 198 F. 3d at 409. *See Thomas v. Delaware State Univ.*, 626 F. App'x 384, 389 n.6 (3d Cir. 2015) (affirming grant of summary judgment where the record contradicted employee's unsupported deposition testimony); *cf. Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")

Moreover, none of these facts that allowed Plaintiff to meet his relatively low burden to establish causation would allow a reasonable juror to find Defendants' proffered reason for termination as "unworthy of credence." *Fuentes*, 32 F. 3d at 765. Again, "the prima facie case merely 'raises an inference of discrimination only because we presume these acts, *if otherwise unexplained,* are more likely than not based on the consideration of impermissible factors.'" *Sempier*, 45 F.3d at 728 (emphasis added). Once the Defendants have provided an explanation for the termination, Plaintiff must provide evidence from which a reasonable jury could reasonably find otherwise.

For example, Plaintiff seems to argue that the very fact that he received two notices regarding his separation from the company—one on February 7, 2019, and one on March 5,

2019—, creates a reasonable inference of pretext. Pl.'s Resp. to Dfs.' Mot. for Summ J. 21.[14]

Yet both parties agree that the February 7, 2019 letter occurred after Plaintiffs phone call with

Madzarac, where, as Plaintiff concedes, he brought up the idea of separation.[15] Hollingsworth

Dep. 78. Indeed the explicit language of the February 7, 2019 separation offer is consistent with

Defendant's proffered justification for the termination. It described the purpose of Madzarac's

January 22, 2019 call as follows:

> My intent was to schedule a meeting with you to discuss information that had
> come to light during your absence suggesting that you violated policy by failing
> to identify certain payments that were made on behalf of a resident for an
> extended period of time. By law, such payments must be disclosed and reported.
> Before making a decision about the consequences of this for your employment,
> we wanted to give you an opportunity to explain.

Ex. NN. Thus Plaintiff's argument on this point is unpersuasive. *See Williams v. Office of Dist.*

*Attorney Erie Cty.*, 751 F. App'x 196, 199 (3d Cir. 2018) ("noting inconsistencies is not the same

as identifying a genuine dispute of material fact") (citing *Podobnik*, 409 F. 3d at 594).

      Similarly, Plaintiff seems to assert that the *very existence* of the February 7, 2019 letter is

sufficient to establish pretext because it shows that the Defendants had "made the decision to

terminate" as of the February 7, 2019 separation offer, prior to the conclusion of their

investigation into the French file. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 3, 21.  Yet the letter by

---

[14] Plaintiff also states that the inclusion of a waiver of liability in the proposed agreement of February 7, 2019
constitutes evidence of pretext. Pl.'s Resp. to Dfs.' Mot. for Summ J. 21. But Plaintiff has failed to provide authority
within the Third Circuit for that proposition, with the exception of one instance where plaintiffs produced evidence
that the offer of severance compensation was outside company policy. *See Staffieri v. Nw. Human Servs., Inc.*, No.
CIV.A. 12-1612, 2013 WL 2245639, at *5 (E.D. Pa. May 22, 2013). Here Plaintiff points to no such evidence.
Considering Plaintiff's testimony that he explicitly raised the idea of separation on the January 22, 2019 phone call
with Madzarac, I find this fact to be immaterial, regardless of its admissibility.

[15] Although what happened during the phone call is a disputed, it is wholly irrelevant to Plaintiff's disparate
treatment claim. Even construing the facts in the light most favorable to the Plaintiff, the discussion revolved around
the topic of Plaintiff's leave of absence and expected return date—not his disability.

its explicit language was simply a proposed agreement, providing Plaintiff *the option* to leave with a severance package as of February 28, 2018—again, based on the call with Madzarac where Plaintiff raised the possibility of separation.[16]  Contrary to Plaintiff's position that "the letter didn't give a choice about his continued employment," when Plaintiff declined the offer on February 25, 2019, he was not immediately terminated. Pl,'s Resp. to Dfs.' Mot. for Summ. J. 21.[17]  Instead, a meeting took place where he was able to explain the lack of documentation of French's income, at which time he was placed on suspension pending an investigation into his representations. Hollingsworth Dep. 113.  After the conclusion of that investigation, he received the letter dated March 5, 2019 explicitly terminating his employment. Hollingsworth Dep. 54; Ex. QQ.  The existence of the initial separation offer does not cast doubt on Defendants' proffered legitimate and nondiscriminatory reason for termination. *See Anderson,* 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.")

Plaintiff next raises the fact that he was not presented with the file to review at the February 28, 2018 meeting as evidence that the whole investigation was a "rouse" [sic]. Pl,'s Resp. to Dfs.' Mot. for Summ. J. 3, 6.  Yet a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik*, 409 F. 3d at 594.  It is undisputed that Defendants held a meeting allowing the Plaintiff to explain himself, and that they conducted an ensuing investigation into

---

[16] Plaintiff himself characterizes the February 7, 2019 letter as an "offer to leave." Pl,'s Resp. to Dfs.' Mot. for Summ. J. 14.

[17] Despite Plaintiff's assertion to the contrary, the fact that Madzarac notified staff not to answer Plaintiff's calls and emails after sending the letter is immaterial. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 21. Ex. W, ECF No. 34-1. As Defendants point out "Madzarac acknowledged that this was because she was in HR, while Graves and Areford were not." Dfs.' Reply B. 8; Madzarac Dep. 64. I must resolve only reasonable inferences in favor of the Plaintiff.

his representations. Graves Dep. 100-01, 154-56, Norwood Dep. 84.  I am thus unpersuaded that the investigation was conducted in bad faith simply because Plaintiff did not have an opportunity to review the physical file at the February 28, 2019 meeting.[18]

Plaintiff argues that comments from Harbison and Beachley constitute evidence of pretext, but points to no evidence that either employee was a decisionmaker.[19]  Consequently such comments will not suffice. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) *(*"Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight . . . ."); *Robinson v. Mondelez Int'l, Inc*. 228 F. Supp. 3d 448, 455 (E.D. Pa. 2017) ("Stray comments, which were made outside of the context of the decision-making process . . . are not enough to overcome' Defendants' legitimate, non-discriminatory reasons for terminating Plaintiff's employment."); *Celucci v. RBS Citizens*, N.A. 987 F Supp. 2d 578, 592 (E.D. Pa 2013) (granting summary judgment when performance issues were well documented, even though plaintiff cited a "handful" of remarks made by her supervisor concerning her "age and retirement plans"); *compare Beird v. Lincoln Univ. of Commonwealth Sys. of Higher Educ.*, No. CV 17-5303, 2020 WL 5569767, at *5 (E.D. Pa. Sept. 17, 2020) (denying summary judgment on employee's FMLA claims where "all three of Plaintiff's most recent supervisors . . .  made remarks implying or declaring that they were

---

[18] Notably, at the February 28, 2019 meeting, Plaintiff himself clarifies that he was *not* told in advance that he would have a chance to review the file—rather that he simply expected they would be reviewing the matter. Ex. B at 2:40-3:05. In his testimony, despite stating that he was promised this opportunity, he also acknowledges that it was an assumption that he would have a chance to review the file. Hollingsworth Dep. 218, 221.

[19] As for decisionmakers, Plaintiff points to the fact that Graves did not "vouch for Hollingsworth" when Beachley made a remark that "[a]s for [Plaintiff], may be best if he did not return." Pl.'s Resp. to Dfs.' Mot. for Summ J. 17; Ex. Q. However, Plaintiffs have not provided the court with any authority for the proposition that a supervisor's failure to make comments supporting an employee constitute evidence of discrimination. Nor am I aware of any such authority. Nor do I find that any reasonable inference of discrimination could be drawn from Graves' previous comment that she is "doubtful that Frank returns, but he might surprise us!" Ex. Q.

unhappy with Plaintiff's constant use of FMLA leave."). No reasonable juror could conclude that the content of the remarks by these non-decisionmakers suggests discriminatory intent on Defendants' part.[20]

Neither will the issue of the changing of the locks cast doubt on Defendants' proffered reason for the termination. Defendants have provided multiple witnesses who understood that changing the locks is part of Enterprise's policy when an employee takes a leave of absence. Norwood Dep. 80; Graves Dep. 156-57. Plaintiff has not pointed to any relevant facts suggesting otherwise, other than that the policy is unwritten.[21] Pl.'s Resp. to Dfs.' Mot. for Summ. J. 15. In fact, Plaintiff himself appears to have participated in this process, having suggesting shortly after he started his leave of absence that a new key needed to be placed in the Fire Lock Box. Ex. SS. Again, a party opposing summary judgment "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik*, 409 F. 3d at 594; *see Delaware State Univ.*, 626 F. App'x at 389 & n.6 (affirming grant of summary judgment where the record contradicted employee's unsupported deposition testimony).

In the end, the record provides clear evidentiary support for Defendants' position. It is not disputed that staff discovered serious compliance issues with a resident file, whose accuracy

---

[20] Moreover, there is no evidence in the record suggesting that Beachley or Harbison were aware of Plaintiff's disability.

[21] Plaintiff points to an instance prior to Enterprise's involvement with PVOC, which is irrelevant, as the property was under different management. Hollingsworth Dep. 294-95; Ex. TT, ECF No. 33-4. Moreover, Plaintiff's own testimony demonstrates that there are a number of unwritten policies to which employees at Enterprise adhere. For example, Plaintiff describes the fact that Jane French was able to "bump up" on the waitlist for a lower rental amount as an example of PVOC's general policy of approving such measures due to residents "particular needs." Hollingsworth Dep. 90.

Plaintiff was tasked with overseeing—issues that violated the governing HUD regulations.[22]

Plaintiff's failure to document an ongoing gift to French, a friend of Plaintiff's mother, had

helped French secure a lower rental amount for her apartment at PVOC. Hollingsworth Dep. 96;

Ex. II.  That failure had occurred over the course of at least 16 months. Harbison Dep. 57-60, 94;

Ex. BB.  Crucially, Plaintiff acknowledges that Harbison's actions upon discovery of the missing

documentation were "appropriate," "expected," and something he himself would have done in

that situation. Hollingsworth Dep. 242, 247, 251.  According to the Plaintiff, Harbison "ha[d] an

obligation to launch an investigation." Hollingsworth Dep. 245.  Plaintiff has not provided any

facts that cast any real doubt on the conclusion that this investigation ultimately led to the

termination decision.

      Whether the Defendants were right or wrong to terminate Plaintiff, based on their loss of

faith in him after investigating his representations, does not impact the lawfulness of that

decision, provided they had a reasonable belief that the decision was justified.[23] *Isley*, 275 F.

Supp. 3d 629 (citing *Capps*, 847 F. 3d at 153); *see Garvin v. Progressive Cas. Ins. Co.*, No.

5:08–CV–3758, 2010 WL 1948593, at *7 (E.D. Pa. May 10, 2010) ("The only inquiry is whether

---

[22] Although Plaintiff argues that "he made *no* effort to conceal these recurring gift payments" because they were set forth on internal ledgers, Pl.'s Resp. to Dfs.' Mot. for Summ. J. 26, this is immaterial.  The salient point is that the payments were not documented as income, as they should have been.  Moreover, Plaintiff's argument that Graves already knew about the payments lacks merit.  To support that contention, he cites only to a text message of September 5, 2017, which does not clearly relate to the French account. Ex. YY, ECF No. 32-3.  That is clearly contradicted by his April 2018 email stating that French's daughter had "stopped assisting in rental payments." Ex. II.

[23] I note that although the Court does not make credibility determinations as to the Plaintiff at the summary judgment stage, I may analyze whether the record supports that Defendants had an honest belief in their own assessments of Plaintiff's representations made to them. *Capps*, 847 F.3d at 154 (affirming grant of summary judgment where Defendant "provided evidence clearly supporting its legitimate, non-discriminatory explanation for why Capps was discharged—its honest belief that [plaintiff] misused his FMLA leave and was otherwise dishonest in violation of Mondelez's policies.")

the decisionmaker . . . honestly believed that Plaintiff had violated the company's policy at issue.").[24]

At the February 28, 2018 meeting with Graves and Madzarac, a meeting that Plaintiff secretly recorded, he informed Defendants that (1) that the French file was *not* sealed and that he was awaiting a gift letter from French's daughter to properly document the income before providing it to the compliance unit for review; Ex. B at 12:52-13:01, and (2) that he had left a note to himself in the file to ensure that he acquired the gift letter from French's daughter and dealt with the outstanding issue. Ex. B at 14:05, 9:31-9:39, 11:54-12:10.  Graves' subsequent investigation led her to determine that Plaintiff's explanation was unsatisfactory. Graves Dep. 100-01, 119, 154-56.  Defendants termination letter states their belief that "human error" could not justify the failure to document at least "16 checks," particularly where the resident had been offered a lower rental amount on that very basis, and where the Plaintiff had a non-work related connection to the resident who had benefited from Plaintiff's failure.[25] Ex. QQ.

In sum, Plaintiff has not pointed to any evidence that would cause a reasonable jury to conclude that Defendants' investigation was simply a ruse, as Plaintiff must ultimately do to show that illegal discrimination had a "determinative effect" on the termination. *CG*, 734 F.3d at 237 & n.11.  Plaintiff has thus failed to meet its "difficult burden" to produce evidence from

---

[24] That is precisely why Plaintiff's argument about Ms. French's rental amount *after the discovery* of the inadequacy of his representations is immaterial. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 25-26.  It is also immaterial that Defendants' testimony as to where to draw the line between "temporary" or "recurring" gifts is slightly inconsistent. None of the deposed witnesses testified that an ongoing gift of more than three months should *not* be considered recurring. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 29. And "Plaintiff concedes that if the payments were considered "recurring" then there would be an obligation for the payments to be documented as part of the certification process." Pl.'s Resp. to Dfs.' Mot. for Summ. J. 28.

[25] Defendants' termination letter describes Plaintiff's relationship to French as a "personal friendship." Ex. QQ.  As discussed *supra*, the record indicates that Plaintiff's mother, not Plaintiff, had the personal friendship with French. This discrepancy does not materially alter the analysis into Defendants' honest belief about their decision. *See Williams*, 751 F. App'x at 199("noting inconsistencies is not the same as identifying a genuine dispute of material fact").

which a reasonable juror could infer that Defendants' rationale is pretextual. *Fuentes*, 32 F.3d at 765.

I will therefore grant Defendants' Motion for Summary Judgment on Plaintiff's claim of Disparate Treatment under the ADA.

### B. Plaintiff's Claim of Failure to Accommodate

I turn next to Plaintiff's claim that Defendants failed to accommodate his disability. An employer commits unlawful discrimination under the ADA if the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of [the employer]." 42 U.S.C. § 12112(b)(5)(A); *see Taylor*, 184 F.3d at 311.

"A plaintiff bringing an ADA failure-to-accommodate claim must establish: '(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'" *Capps*, 847 F.3d at 157 (citing *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F. 3d 240, 246 (3d Cir. 2006)).

Having already found that Plaintiff is disabled under the ADA, and since the parties agree he disclosed this information to his employer on November 28, 2018, I turn to Plaintiff's alleged request for a reasonable accommodation. The only leave of absence that Plaintiff ultimately requested was the 12-week leave of absence pursuant to the FMLA, which, by all accounts, he received. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 2. On February 28, 2019, he informed Graves and Madzarac that he had been cleared to return to work and was not requesting additional time off. Ex. B at 21:00-21:15; 29:04-29:21. Thus, assuming for purposes of argument that his FMLA

leave was also a reasonable accommodation, the Defendant "provided and . . . [Plaintiff] received the accommodation he asked for." *Capps*, 847 F. 3d at 157 (granting summary judgment on Plaintiff's failure to accommodate claim under the ADA where record did not support any failure to accommodate).[26]

Construing the facts in the light most favorable to the Plaintiff, he did not make an accommodation request during the January 22, 2019 phone call with Madzarac. During that call, he stated that his goal was to return by the end of FMLA and asked whether the end of FMLA was "considered a hard date." Hollingsworth Dep. 77.  By his own testimony, he never actually asked that the date be pushed back during that call. Nor did he ever request the additional time, given his statement on February 28, 2019 that he was ready to return to work. Ex. B at 21:02-21:12; 29:04-29:23. With regard to an extension beyond the FMLA leave he received, Plaintiff simply "has not shown that he requested an accommodation for his disability." *Isley*, 275 F. Supp. 3d at 63. Defendants could not grant "an accommodation that . . . [was] no longer requested." Dfs.' Mot. for Summ. J. 45 (alterations in original).

I will therefore grant the Defendants' Motion for Summary Judgment with regard to Plaintiff's claim that Defendants discriminated against him by failing to provide a reasonable accommodation.

### C. **Retaliation**

Plaintiff also argues that his request for an accommodation due to his disability caused the Defendants to retaliate against him by terminating his employment. Pl.'s Resp. to Dfs.' Mot. for Summ. J. 15; *Sulima v. Tobyhanna Army Depot*, 602 F. 3d 177, 188 ("Prohibited

---

[26] Given this conclusion, I need not decide whether Plaintiff's request for leave pursuant to FMLA also constituted a reasonable accommodation request.  I note that "a request for FMLA leave may qualify, under certain circumstances, as a request for a reasonable accommodation under the ADA." *Id.* at 156–57.

discrimination under the ADA includes retaliation against an employee for requesting an

accommodation.").[27]

"A 'pretext' claim of illegal retaliation follows the familiar burden shifting analysis . . .

set forth in *McDonnell Douglas* . . . ." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188

(3d Cir. 2003).  Assuming that Plaintiff's request for FMLA leave also constituted a reasonable

accommodation request, and hence is actionable under the ADA, the analysis is the same in

nearly all respects as the pretext analysis discussed *supra,*[28] and leads to the same result.[29]

Plaintiff has failed to meet his burden to show that Defendants' proffered reason is

pretextual.  As discussed at length above, Defendants clearly had a sufficient basis to terminate

Plaintiff by virtue of his work performance and conduct.  Given those clear facts, no reasonable

---

[27] Although I have already found that Plaintiff is disabled under the ADA, I note that "a person's status as a 'qualified individual with a disability' [under the ADA] is not relevant in assessing the person's claim for retaliation under the ADA." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 188 (3d Cir. 2003).  That is because the unambiguous text of the ADA "protects any individual" who has raised an issue under the ADA. *Id.* (citing 42 U.S.C. 12203(a)).

[28] Plaintiff's request for leave occurred and was granted the same day as his disclosure of his disability to Graves. Hollingsworth Dep. 66, 147; Ex. W; Ex. X; Pl.'s Resp. to Defs.' Req. for Admis. No. 8.

One noteworthy difference in the analyses involves the significance of the phone call between Plaintiff and Madzarac on January 22, 2019. Plaintiff states that Madzarac spent fifteen minutes asking him when he was returning to work. Hollingsworth Dep. 64. Although disputed, I find that fact immaterial here because, even viewed in the light most favorable to the Plaintiff, it would not tend to disprove that Defendants' proffered reason for the termination constituted the sole reason for the decision.

Plaintiff acknowledges that Harbison's investigation into the French file "doesn't have anything to do with [his] request for FMLA leave" and was "[u]nrelated to [his] accommodation request." Hollingsworth Dep., 250-251. That investigation began on January 2, 2019, weeks before the phone call occurred. Harbison Dep. 57, 93-96. Likewise Defendants' email chain regarding the "Frank Hollingsworth 'termination issue'" occurred a week after Harbison's discovery, but more than 40 days after Plaintiff first took leave, and again, weeks before the January 22, 2019 phone call. Ex. LL. This timeline is wholly consistent with Defendants' proffered legitimate, nondiscriminatory reason for the termination. *See Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). If, on the other hand, Defendants' emails involving Plaintiff and a "termination issue" had begun *after* the January 22, 2019 phone call with Madzarac, this disputed fact might have been material.

[29] In his briefing, Plaintiff has failed to articulate a discernible distinction between the evidence from which he attempts to create a triable issue of fact involving discrimination and that from which he attempts to show retaliation.

jury could find that retaliation "had a determinative effect" on the Defendants' decision to terminate. *CG*, 734 F.3d at 237 & n.11.

I will therefore grant summary judgment in favor of Defendants on Plaintiff's claim of retaliation under the ADA.

## V.     PHRA Claims

Plaintiff has also filed closely related claims of disability discrimination and retaliation under the Pennsylvania Human Relations Act ("PHRA"). "The PHRA is basically the same as the ADA in relevant respects 'and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts.'" *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002) (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)). The resolution of Plaintiff's ADA claims therefore also disposes of his PHRA claims.[30]

I will therefore also grant Defendant's Motion for Summary Judgment with regard to the Plaintiff's claims under the PHRA.

## VI.     FMLA Claims

### A.  Interference

The statutory basis for FMLA interference appears in 29 U.S.C. § 2615(a)(1), which states that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." Department of

---

[30] The Pennsylvania Legislature has not adopted Congress's expanded definition of disability and courts therefore evaluate PHRA claims under the ADA's pre–2008 definitions of disability. *Rubano v. Farrell Area Sch. Dist.*, 991 F.Supp.2d 678, 689 n.7 (W.D. Pa. 2014). Neither party has briefed this matter, however, and it is therefore unclear if Plaintiff's condition would qualify as a disability under the PHRA. But because I am finding that Plaintiff's ADA claim fails even if he is deemed "disabled," I need not determine whether he is disabled within the meaning of the PHRA. *See Isley.*, 275 F. Supp. 3d at 626–28.

Labor ("DOL") regulations passed pursuant to the statute state that "employers cannot use the taking of FMLA leave as a negative factor in employment actions . . . ." 29 C.F.R. § 825.220(c). In order to make a claim of interference under the FMLA, a plaintiff must establish that:

> (1) he or she was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of his or her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which he or she was entitled under the FMLA.

*Capps*, 847 F.3d at 155 (citing *Ross v. Gilhuly*, 755 F.3d 185, 191-192 (3d Cir. 2014)).

In this matter the dispute is solely over the fifth prong.  The question is whether Plaintiff was denied benefits to which he was entitled under the FMLA. Plaintiff advances two separate theories for interference:  first, that Defendants discouraged him from exercising his rights, Pl.'s Resp. to Dfs.' Mot. for Summ. J 46-48,  and second, that they denied him his right to return to work at the end of his leave of absence. *Id.* at 45.

With respect to an interference claim, "the employee need not show that he was treated differently than others[, and] the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Ross,* 755 F.3d at 192 (internal citations omitted). Also, "[b]ecause the FMLA [interference claim] is not about discrimination, a *McDonnell Douglas* burden-shifting analysis is not required." *Id.* (internal citations omitted).

### i.    Discouragement from exercising FMLA rights

Plaintiff's argues that Defendants took steps to discourage him from exercising his FMLA right to a continued leave of absence. First, he asserts that Defendants' February 7, 2019 letter, which included a proposed severance agreement and separation date, constitutes discouragement under 29 U.S.C. § 2615(a)(1). Pl.'s Resp. to Dfs.' Mot. for Summ. J 46-48. He further argues that his suspension constitutes a second instance of discouragement. *Id.*

The FMLA "grants an 'eligible employee' the right to 12 work-weeks of leave over any 12-month period because of, among other things, 'a serious health condition that makes the employee unable to perform the functions' of the employee's position." *Sommer v. The Vanguard Group*, 461 F.3d 397, 399 (3d Cir. 2006) (citing 29 U.S.C. § 2612(a)(1)).  Addressing unlawful FMLA interference, the DOL has stated that it includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." *Sommer,* 461 F.3d at 399 (quoting 29 C.F.R. § 825.220(b)).  To show an employer discouraged an employee from taking FMLA leave, an employee must show the employer took some affirmative step. *See, e.g.*, *Hilborn v. Cordaro,* 2007 WL 2903453 (M.D. Pa. Sept. 28, 2007).

But the Third Circuit has made clear that the employee must show actual injury. *Conoshenti v. Public Service Elec. & Gas Co.,* 364 F.3d 135, 143 (3d Cir. 2004). Even assuming that Defendants fully intended to discourage the Plaintiff from exercising his right to additional time off under the FMLA, Plaintiff did not suffer any actual injury. Indeed, Plaintiff was on leave from November 28, 2018 through February 28, 2019. As Plaintiffs readily admit, this constituted the "the full twelve weeks" to which he was entitled. Pl.'s Resp. to Dfs.' Mot. for Summ J. 2.

 Defendant's Motion will be granted on this claim as well.

### ii.  **Interference via Denial of Return to Work**

Plaintiff also alleges that the Defendant interfered with the exercise of his FMLA rights by denying him his right to return to work.  Indeed, the FMLA guarantees that employees who take FMLA leave may be reinstated to their "former position or an equivalent one" under 29 U.S.C. § 2614(a)(1); *see Davis v. Temple University Hospital*, *Inc.*, No. 14-5981, 2015 WL 7180505, at *4 (E.D. Pa. Nov. 16, 2015).

However, the FMLA does not "entitle any restored employee to . . . any right, benefit, or position of employment *other* than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3) (emphasis added); *see Davis*, No. 14-5981, 2015 WL 7180505, at *4 (E.D. Pa. Nov. 16, 2015) (quoting *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 977–78 (8th Cir. 2005). ("[t]he FMLA simply does not force an employer to retain an employee on FMLA leave when the employer would not have retained the employee had the employee not been on FMLA leave."). In other words, "the FMLA does not provide employees with a right against termination for a reason other than interference with rights under the FMLA." *Sarnowski v. Air Brooke Limousine, Inc.*, 510 F.3d 398, 403 (3d Cir. 2007).

As discussed at length above, Plaintiff has not produced sufficient evidence to permit a reasonable jury to conclude that Defendants terminated him for any reason relating to his FMLA leave. The record provides clear evidentiary support for the conclusion that Defendants terminated Plaintiff due to a loss of confidence in his ability to manage PVOC, as stated in the March 5, 2019 termination letter. Ex. QQ. Plaintiff admits that the need to investigate Ms. French's file was "appropriate", "expected," and "doesn't have anything to do with [his] request for FMLA leave." Hollingsworth Dep. 242, 245, 247, 251. The Plaintiff has failed to put forward evidence that could raise any reasonable doubt about this. *See Sarnowski*, 510 F.3d at 403 ("[Plaintiff] will not prevail on his interference claim if [Defendant] can establish that it terminated [him] for a reason unrelated to his intention to exercise his rights under the FMLA.").

I must also grant Defendants' Motion as to Plaintiff's claims of interference under the FMLA.

### B.  Retaliation

Claims of FMLA retaliation arise under 29 C.F.R. § 825.2209(c), a Department of Labor regulation which states that employers cannot use the taking of FMLA leave as a negative factor in employment actions . . . ." *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301 (3d Cir. 2012); *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 508 (3d Cir. 2009). Under 29 C.F.R. § 825.2209(c), "the question is whether [Plaintiff's] FMLA-qualifying leave . . . was a "negative factor" that hastened [his] termination. *Lichtenstein*, 691 F. 3d at 311 (internal citations omitted).

As with the ADA retaliation claim, I evaluate this claim under the *McDonnell Douglas* framework. *See Lichtenstein*, 691 F. 3d at 302. Given Plaintiff's argument that the protected conduct under the FMLA "is the same protected conduct which forms the basis for his ADA retaliation claim," Pl.'s Resp. to Dfs.' Mot. for Summ. J. at 32, the analysis is the same— and leads me to the same conclusion.[31]  Although Plaintiff is able to establish a prima facie case of causation, he fails to provide evidence to call into doubt that Defendants had a legitimate, nondiscriminatory reason for the termination, nor to indicate that the employer used taking of leave under the FMLA as a "negative factor" in the termination decision.

I will therefore also grant summary judgment with regard to Plaintiff's claims of retaliation under the FMLA.

### VII.   Conclusion

---

[31] Here I have undertaken the typical pretext analysis under the *McDonnell Douglas* framework at the suggestion of the parties. I note that analyzing these claims under a mixed motive framework would lead to the same conclusion. *See Conoshenti*, 364 F.3d at 148 (3d Cir. 2004) ("Even when viewed in a light most favorable to Conoshenti, the record clearly indicates that Conoshenti would have been discharged absent any consideration of his twelve weeks of FMLA-protected leave.")

Because Plaintiff has not shown that a factfinder could reasonably conclude he was the victim of discrimination or retaliation in violation of the FMLA, the ADA, or the PHRA, Plaintiff's Complaint must be dismissed in its entirety. An appropriate order follows.


/s/ Gerald Austin McHugh
United States District Judge